O

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INTRALIFE, INC. and | § | |
| TOM PODL, | § | |
| | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-4302 |
| | § | |
| INTERMEDICS, INC., | § | |
| | § | |
|     Defendant. | § | |

MEMORANDUM AND ORDER

Pending is Defendant Intermedics, Inc.'s Motion for Summary Judgment (Document No. 12). After carefully considering the motion, response, reply, and the applicable law, the Court concludes as follows:

I.  Background

Plaintiffs Intralife, Inc. ("Intralife") and Tom Podl ("Podl") (collectively, "Plaintiffs") bring this breach of contract action against Defendant Intermedics, Inc. ("Defendant"), a manufacturer and distributor of cardiac rhythm management devices, including pacemakers ("Bradycardia Products") and implantable cardio-defibrillators ("Tachycardia Products") (collectively, "Products"). *See* Document No. 12 at 2.

In 1982, Defendant and Intralife, through its President and sole shareholder Podl, entered into a Sales Representative Agreement (the "1982 Agreement") for a term of ten years, with an option to renew for an additional ten-year period. Id. Under the 1982 Agreement, Intralife agreed to act as Defendant's sales representative in Alaska, Washington, Oregon, Montana, and Western Idaho (the "Territory"), and Defendant agreed to pay Intralife a 22% commission on all sales of Defendant's Products in the Territory. Id. at 2-3. The 1982 Agreement further authorized Intralife to contract with independent sales representatives (the "Sub-Representatives") and pay them a portion of the 22% sales commission to market Defendant's Products and service customer accounts in the Territory. Id.

Although the parties initially operated successfully under the 1982 Agreement, Defendant's competitors eventually began luring away Intralife's Sub-Representatives with higher commission rates and more advanced products. Id. at 4-5. Concerned that the loss of Sub-Representatives, who by now had developed strong relationships with Defendant's customers, would cause a decline in sales of Defendant's products and thereby reduce Plaintiffs' commissions, the parties began negotiating a new agreement (the "1992 Agreement" or the "Agreement"). Id. ex. 2. Under the 1992 Agreement, Plaintiffs agreed to terminate the 1982 Agreement and allow Defendant to contract directly with the Sub-Representatives

in exchange for override commissions ("overrides") based on sales of Defendant's Products in the Territory through the period ending January 31, 2002. Id. ¶¶ 2.1, 3.1-3.2, 7.1. Specifically, Defendant agreed to pay Intralife a 5% override on Bradycardia Products sold in the Territory up to a total amount of $15,000, and thereafter, to pay the 5% override directly to Podl. Id. ¶ 3.1. Defendant also agreed to pay Podl a 4% override on Tachycardia Products sold in the Territory. Id. ¶ 3.2. The Agreement further provided that in the event of a "Combination"--that is, if Defendant acquired, merged with, or was acquired by an entity engaged in the sale of Products--an adjustment factor would be applied to calculate revised override rates applicable to sales of Defendant's Products in the Territory following the Combination. Id. ¶¶ 1.2, 3.3.[1]

In February 1999, Defendant's parent corporation, Sulzer Medica, Ltd., sold its entire electrophysiology business, including Defendant, to Guidant Corporation ("Guidant"), a leader in bradycardia and tachycardia technology. Document No. 12 at 7. Guidant's acquisition of Defendant constituted a "Combination"

---

[1] Paragraph 3.3 of the Agreement provides two formulas for calculating the adjustment factor. See Document No. 12 ex. 2 ¶ 3.3. The first formula (the "Temporary Formula") calculates the adjustment factor at the time of the Combination and applies prospectively to sales made in the first six months following the Combination. Id. The second formula (the "Combination Formula") calculates the adjustment factor in the seventh month following the Combination and applies retroactively to all sales made after the Combination. Id.

triggering application of the formulas set forth in paragraph 3.3 of the Agreement. Id. Thereafter, from February 1, 1999 through January 31, 2002, Defendant paid a total of $15,000 in bradycardia overrides to Intralife and $504,448.38 in bradycardia overrides to Podl. See Document No. 12 at App. 7-8, 63.

In their Original Complaint, Plaintiffs allege that Defendant improperly interpreted the Combination Formula set forth in paragraph 3.3 of the Agreement and applied an adjustment factor that resulted in underpayments to Plaintiffs. Document No. 1 ¶ 6.2.[2] According to Podl, the plain language of the Combination Formula requires a recalculation of the denominator of the Temporary Formula to reflect the combined sales of Defendant and Guidant after the Combination, but the Combination Formula does not provide for a recalculation of the numerator used in the Temporary Formula. See Document No. 15 ¶¶ 6, 21, 30. Rather, both the Temporary Formula and the Combination Formula use the same numerator--Defendant's sales during the six-month period preceding the month of Combination. Id.[3]

---

[2] Specifically, Podl contends that he is owed an additional $360,572.48 in bradycardia overrides and an additional $27,793.36 in tachycardia overrides. See Document No. 12 at App. 63, 71.

[3] Applying Podl's interpretation to the Combination entity's actual sales, the revised bradycardia override rate equals $2,376,217.50 ÷ ($1,388,956.30 + $3,855,713.67) × 5%, or approximately 2.2653642%. See Document No. 12 at App. 56-57. Thus, for the three-year period in dispute, Podl was entitled to 2.2653642% of $38,184,627.03, or $865,020.86 in bradycardia overrides. Id. at App. 63. The revised tachycardia override rate

4

Defendant, on the other hand, contends that although the language used to describe the Combination Formula is "somewhat confusing," it is reasonable to construe the language to require a recalculation of both the numerator and the denominator to reflect Defendant's sales during the six-month period following the Combination.  *See* Document Nos. 12 at 14-15; 18 at 3.  Thus, Defendant argues, it properly calculated and applied the Combination Formula, and Podl cannot show a breach of the Agreement.  Document No. 12 at 13.  Defendant also contends that regardless of the formula applied, Intralife cannot show it suffered any damages because Defendant paid it $15,000 in bradycardia overrides, the maximum amount to which it was entitled under the Agreement.  Id.

## II.  Summary Judgment Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party must "demonstrate

---

equals $117,050 ÷ ($0 + $9,426,326.08) × 4%, or approximately .0496694%.  Id. at App. 64-65.  Podl was therefore entitled to .0496694% of $55,956,709.50, or $27,793.36 in tachycardia overrides.  Id. at App. 71.

the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. <u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. <u>Id.</u> "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." <u>Id.</u>

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing <u>Matsushita</u>, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule

56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial."  Anderson, 106 S. Ct. at 2513.

III.   Discussion

A.   Principles of Construction

Under Texas law,[4] a court's primary objective in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument.  *See* Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004);  J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003).  To accomplish this objective, courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  J.M. Davidson, 128 S.W.3d at 229; *see* Gonzalez, 394 F.3d at 392.  The terms used in the contract should be accorded their plain, ordinary meaning, unless the contract itself shows that the parties intended the terms to have a different, technical meaning.  *See* Gonzalez, 394 F.3d at 392; Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 323 (5th Cir. 2001).

---

[4] Paragraph 10.1 of the Agreement provides that Texas law governs the validity, construction, and enforcement of the Agreement.  *See* Document No. 12 ex. 2 ¶ 10.1.

"'If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous.'" Gonzalez, 394 F.3d at 392 (quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995)).  "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent."  J.M. Davidson, 128 S.W.3d at 229. However, "'[a] contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term.'" Gonzalez, 394 F.3d at 392 (quoting Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 497 (5th Cir. 2002)).

B.   Intralife's Claim

Defendant moves for summary judgment on Intralife's breach of contract claim on the ground that Intralife admittedly received all amounts to which it was entitled under the Agreement.  *See* Document No. 12 at 13.  Paragraph 3.1 of the Agreement obligated Defendant to pay Intralife "an override of five percent (5%) of Company's Net Sales of Bradycardia Products sold in the Territory, except Alaska, from the Effective Date *until such payments total Fifteen Thousand Dollars ($15,000)*."  Document No. 12 ex. 2 ¶ 3.1 (emphasis added). During his deposition, Podl admitted that Intralife received $15,000 in bradycardia overrides in accordance with paragraph 3.1.

Document No. 12 at App. 7-8.  Podl further admitted that no provision in the Agreement entitled Intralife to overrides on sales of Defendant's Tachycardia Products.  Id.  Intralife offers no defense of it claim in response to Defendant's motion for summary judgment.  *See* Document No. 15.  Because Intralife has presented no evidence that it suffered any damages as a result of Defendant's alleged breach of the Agreement, Defendant is entitled to summary judgment on Intralife's claim.  *See* Bridgmon v. Array Sys. Corp., 325 F.3d 572, 577 (5th Cir. 2003) (including damage to plaintiff resulting from defendant's breach as essential element of a breach of contract claim).

C.  Podl's Claim

Defendant also contends that it is entitled to summary judgment on Podl's breach of contract claim because Podl received all amounts to which he was entitled under paragraph 3.3 of the Agreement.  Paragraph 3.3 provides that "[i]n the event of a Combination, the overrides set forth in paragraphs 3.1 and 3.2 above shall be adjusted to reflect the respective shares of the Base held by the parties to the Combination."  Document No. 12 ex. 2 ¶ 3.3.  The Agreement defines the term "Base" as:

> the Net Sales of Products by Company plus the Net Sales of Products by an entity (acquiring or acquired by Company and resulting in a Combination) in the Territory during the six (6) month period immediately preceding the month in which the Combination is consummated, except as provided in paragraph 3.3.

9

Id. ¶ 1.1.[5]  The term "Company" refers to Defendant.  Id. ¶ 1.3.

Paragraph 3.3 first sets forth the Temporary Formula for calculating the revised override rates:

> The adjustment factor is the quotient of Company's portion of the Base divided by the Base. Thereafter, the quotient is multiplied by the overrides set forth in paragraphs 3.1 and 3.2 above.  The respective products resulting from said calculations shall be the revised overrides applicable to the Products sold by the entity resulting from the Combination from and after the date of Combination for a period of six (6) months.  For example, if the Company's portion of the Base of Bradycardia Products applicable to the override set forth in paragraph 3.1 is $15 million, and the Base is $25 million, the revised override applicable to Bradycardia Products pursuant to paragraph 3.1 sold by the entity resulting from the Combination is (15 ÷ 25) × 5 or 3%.

---

[5] The exception to this definition of "Base" is found in the last three sentences of paragraph 3.3, as follows:

> In the case of Tachycardia, no month shall be included in the six (6) month period for purposes of computing the Base, irrespective of the date of Combination, which is less than two years after the final pre-market approval by the Federal Drug Administration of the defibrillation device currently known as 'Res-Q.'  If a Combination occurs at a point in time that prevents a calculation of the Base because there has been no final pre-market approval or two years have not elapsed since pre-market approval, then Company will continue to pay the override on Company's Tachycardia Products at the rate specified in paragraph 3.2 until the Base can be computed.  Once the Base can be computed, the override will be computed for the Combination and applied henceforth to the total Net Sales of Tachycardia Products by the Combination.

Document No. 12 ex. 2 ¶ 3.3.  The parties agree that this contingency did not occur and the exception to the definition of the term "Base" therefore has no application in this case.

Id. ¶ 3.3.  In other words, applying the Temporary Formula, the revised commission rates equal Defendant's sales during the six-month period preceding Combination divided by the combined sales of Defendant and Guidant during the six-month period preceding Combination, multiplied by the rates set forth in paragraphs 3.1 (bradycardia rate) and 3.2 (tachycardia rate) respectively.[6]  Paragraph 3.3 then describes the Combination Formula for calculating the revised override rate as follows:

> Commencing with the seventh (7th) month following a Combination, the adjustment factor is the quotient of the company's portion of the Base divided by the actual sales of the Combination for the six-month period.  Thereafter, the quotient is multiplied by the overrides set forth in paragraphs 3.1 and 3.2 above.  The respective products resulting from said calculations shall be the revised overrides applicable to the Products sold by Combination retroactively applied to the date of Combination through and including January 31, 2002.  For example, if the Company's portion of the Base of Bradycardia Products applicable to the override set forth in paragraph 3.1 is $15 million, and the actual sales of the Combination is $20 million, the revised override retroactively applied to Bradycardia Products pursuant to paragraph 3.1 sold by the Combination is (15 ÷ 20) × 5 or 3.75%.

Id. ¶ 3.3.[7]

---

[6] The parties are agreed that Defendant properly calculated and applied the Temporary Formula.

[7] Both Podl and Defendant agree that this language requires a recalculation of the denominator to reflect the combined sales of Defendant and Guidant during the six-month period following the Combination.

11

Although the parties proffer different interpretations of the Combination Formula's numerator, paragraph 3.3 clearly and unambiguously provides that the numerator is "the company's portion of the Base." Id. ("[T]he adjustment factor is the quotient of *the company's portion of the Base* divided by the actual sales of the Combination for the six-month period.") (emphasis added). "Base," as has been seen, is precisely defined in paragraph 1.1. Because the exception to this definition does not pertain to this dispute, see footnote 5 above, "Base" is determined by adding Defendant's Net Sales of Products in the Territory during the six-month period immediately preceding the month in which the Combination is consummated, to the Net Sales of Products by the acquiring or acquired company within the Territory during the same six-month period. See id. ¶ 1.1. The parties are agreed that Defendant correctly applied this definition of "Base" in computing the Temporary Formula for the first six months after the Combination. It is the computation to be made in the seventh month after the Combination, that is, of the "Combination Formula," where the parties differ. The sole difference between the wording of the Temporary Formula and the wording of the Combination Formula may readily be observed by comparing them side by side:

| Temporary Formula:                                                                                                                                                                                                                                                                                                                             | Combination Formula:                                                                                                                                                                                                                                                                                                                                                                                                                    |
|---|---|
| The adjustment factor is the quotient of *Company's portion of the Base* divided by the <u>Base</u>.  Thereafter, the quotient is multiplied by the overrides set forth in paragraphs 3.1 and 3.2 above. The respective products resulting from said calculations shall be the revised overrides applicable to the Products sold. . . . | [T]he adjustment factor is the quotient of the *company's portion of the Base* divided by the <u>actual sales of the Combination for the six-month period</u>.  Thereafter, the quotient is multiplied by the overrides set forth in paragraphs 3.1 and 3.2 above. The respective products resulting from said calculations shall be the revised overrides applicable to the Products sold. . . . |

The italicized words above in both formulas state the numerator of each quotient, and the underlined words state the denominator of each quotient.  The sole difference between the two formulas, of course, is in the expression of the denominator that is to be divided into the "Company's portion of the Base."  The Company's portion of the Base, that is, Defendant's "Net Sales of Products . . . in the Territory during the six (6) month period immediately preceding the month in which the Combination is consummated," remains constant in both formulas.  That is the fixed numerator. Thus, in the Temporary Formula, the "Company's Portion of the Base" is divided by the Base itself.  In the Combination Formula, however, the "Company's Portion of the Base" is divided not by the Base, but by the "actual sales of the Combination for the six-month period."

13

Paragraph 3.3 provides examples of how to apply both formulas, and those examples are consistent with the specific language just examined. The example given for the Temporary Formula assumes that the "Company's portion of the Base" is $15 million and the "Base" is $25 million, and the math is presented to show how the resulting revised override during the first six months is 3%. The example given for the Combination Formula restates that the "Company's portion of the Base" is the identical $15 million [because that figure, by definition, was established during the six-month period immediately preceding the month in which the Combination is consummated and remains constant], and assumes that the "actual sales of the Combination" is $20 million, a *different* figure than the $25 million that constituted the Base. The math is then presented to show how the resulting revised override calculated in the seventh month becomes 3.75%. Hence, again in the examples contained in paragraph 3.3, the *denominator* is the only figure that is adjusted in calculating the Combination Formula.

Defendant argues that this application of the Combination Formula creates an inverse correlation between Defendant's sales and the amount of overrides received by Podl, and therefore produces "illogical and absurd results," particularly when one considers the other forms of Combination that could have occurred under paragraph 1.3 of the Agreement. *See* Document No. 15 at 18-

20.[8]  Even though the Combination Formula may in fact yield unexpected results or have consequences that were not fully considered by the parties when they drafted the Agreement, the Court is required to apply the Combination Formula as it was written by the parties. *See, e.g.,* Frost Nat'l Bank v. L&F Distribs., Ltd., 122 S.W.3d 922, 932 (Tex. App.--Corpus Christi 2003) ("Parties make their own contracts and it is not within the province of the court to vary contractual terms in order to protect parties from the consequences of their own oversights and failures in nonobservance of obligations assumed.  The courts are not at liberty to redraft the terms of a contract while professing

---

[8] For example, Defendant argues that the language in paragraph 1.3 demonstrates that when they executed the Agreement, the parties contemplated the possibility of a Combination scenario in which Defendant acquired another entity, through which Defendant would presumably be able to *increase* sales of its own Products. Applying a plain reading of the Combination Formula to this Combination scenario results in a *decrease* in the revised override commission percentages, and therefore proportionately lower override payments to Podl, despite the increase in Defendant's sales. *See* Document No. 12 at 18-20. Defendant argues that this is illogical and that the Court should therefore adopt its proposed construction of the clause.

The Court is not persuaded that Defendant's hypothetical necessarily produces an illogical result. One can readily imagine plausible business reasons for reduction of Podl's override percentage when it is applied to a much larger sales volume attributable to a capital investment to acquire a new company rather than to the sales network built by Podl before 1992. Attempts to rationalize one formula or another, however, are all irrelevant when, as here, the formula is clearly stated. The contract must be applied as written whether or not one party now believes that under certain hypothetical circumstances it could have produced illogical results.

to construe it.  In construing contracts, courts cannot, by implication, find terms in opposition to the express language that the parties themselves have written into their contracts.") (citing Dallas Power & Light Co. v. Cleghorn, 623 S.W.2d 310, 311 (Tex. 1981); Provident Fire Ins. Co. v. Ashy, 169 S.W.2d 684, 687 (Tex. 1942)).

Because Defendant has not presented summary judgment evidence that it properly calculated the numerator of the Combination Formula and paid to Podl the revised overrides due to him after the Combination, it is not entitled to summary judgment on Podl's breach of contract claim.[9]

## IV.  Order

Accordingly, it is

ORDERED that Defendant Intermedics, Inc.'s Motion for Summary Judgment (Document No. 12) is GRANTED IN PART, and Plaintiff

---

[9] Defendant also argues that Podl's breach of contract claim should be dismissed as a sanction for causing Peter Dorflinger ("Dorflinger"), Defendant's former general counsel and Podl's designated expert witness, to violate his ethical obligations to Defendant. See Document No. 15 at 24-25.  The Court is not persuaded that Podl is the person to be sanctioned for attorney Dorflinger's alleged breach of ethical duties owed by Dorflinger to Defendant.  Defendant has other avenues of redress against Dorflinger if it has been aggrieved by misconduct of its former general counsel.

Intralife, Inc.'s breach of contract claim is DISMISSED on the merits. The motion is otherwise DENIED.

The Clerk will enter this Order and send copies to all counsel of record.

SIGNED at Houston, Texas on this 31st day of May, 2005.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE